begin our proceedings today. We have a motion and I'll turn it over to Judge O'Malley. Thank you. I hate this time of year. This is the second law clerk I've seen sworn in this week, which means they're leaving me. But I move the admission of Matthew Seip, who's a member of the bar and is in good standing with the highest court of Virginia. I have knowledge of his credentials and I'm satisfied that he possesses the necessary qualifications. I am very familiar with his credentials. He has been a wonderful law clerk and we have enjoyed having him and will be sad to see him go. He went to Yale Law School, which I forgive him for, and I tell him constantly it's because that undergraduate degree in economics and math from UVA grounds him enough so that it brings him down to earth and down to my level. But he clerked for Judge Mays in Tennessee on the district court before he came to clerk for me, and he's about to go become a Supreme Court fellow. At some point, he'll maybe get a real job that makes money, but in the meantime, he is progressing through the federal system quite well. So I am grateful for all of his talents and for the fact that he's so fun to have around. And with that, I move his admission. I do not know this man, but Supreme Court fellow is good enough for me. It's fine. I think it's fine. I like the fun part. I've gotten to know Matthew a bit through his year, and on behalf of Judge Chad, we enthusiastically grant the motion. Please stand and raise your right hand. The Assembly of the Square Enforcement, would you report to us, sir, that the Chancellor of this Court, Albrecht Dicke, and the Court of the Bar, would you support the Constitution of the United States Court of Appeal? First case for argument this morning is 16-1275, Yang v. Boston Scientific Corporation. Just before you begin, Mr. Josepher, I'd just like to mention, because of the division of time, I see Mr. Wolfe has saved time for his cross appeal, and candidly, the panel has questions about the cross appeal, not the merits of it, but whether or not, in fact, it is a cross appeal as opposed to just an alternative basis for affirmance, and therefore, we're not inclined to split the time up separately for the cross appeal, so we'll just consider the time to be 10-5-15. Yes, Your Honor. Thank you. Mr. Josepher, whenever you're ready to begin. Good morning, and may it please the Court. The district court overturned the jury verdict based on ensnarement without ever actually determining ensnarement, which is to say, without determining whether the scope of equivalence actually ensnared the prior art. In doing so, the court committed three fundamental errors. First, in rejecting Dr. Zhang's proposed hypothetical claims. Second, in stopping the analysis there. And third, in failing to recognize that this issue had not been properly preserved in any event. Are you saying that it was the court's job to come up with a hypothetical claim, even if yours were inadequate? No. As you know, we think ours were adequate, but if they were not, if there were some difficulty, the court had several options available to it. It could have, after identifying a problem with a hypothetical claim, it could have modified that hypothetical claim. It could have come up with its own. It could have requested, as one does say in Markman, submission of a new hypothetical claim to address an issue. It could have even at least considered the proposed hypothetical claim by BSC and modified it. We don't think BSC's proposed hypothetical claim was proper either. It's your burden, however, to establish that the range of equivalence that you're seeking under the doctrine does not ensnare the prior art, right? Ultimately, yes. So, I mean, the first step of that journey is coming up with a hypothetical claim. I think that's your responsibility, isn't it, as the patentee, and not the district court's responsibility or the defendant's responsibility. It's up to you to imagine what your conception is of the range of equivalence that you are seeking under the doctrine. So, I guess I'm trying to understand logically why should anyone else have to pick up the bags here to sort things out? Well, I don't know that anyone else had to pick up the baggage. One, I mean, in a moment I'd like to get to why we don't think there's any problem with the hypothetical claims, but assuming there was, which is your question, Markman's, I think, the best analogy, maybe the only analogy, where it happens every day in this, probably in this country, where a court rejects a plaintiff's proposed claim construction on a claim term. The court doesn't then refuse to construe the claim term and dismiss the suit. The court instead issues what it thinks is an appropriate claim construction, and the suit proceeds under it. A more draconian approach after a jury verdict makes little, if any, sense. And again, we weren't saying that the court had to just toss us out and start from scratch. Instead, it could do what, say, this court did in Streamfeeder, where in Streamfeeder, this court rejected the hypothetical claim that had been proposed by the plaintiff and accepted by the district court. This court then, after identifying the error in it, modified it accordingly and proceeded to rule on ensnarement. Again, ourselves could have asked us to come back. I mean, I know you think your hypothetical claims were fine, but if they're not, do you have an alternative hypothetical claim that you think would avoid ensnarement? I'm sure the hypothetical claims we put in, we could rephrase in ways that wouldn't seem to matter to us, but would. So, for example, take hypothetical claim three. The idea is that, look, the hypothetical claims obviously are supposed to mirror the theory of equivalence at trial, right? The point is to test the theory of equivalence at trial against the prior art. So the theory of equivalence at trial was that even if the microelements in the expressed products were not connecting struts within the language of the claims, they nonetheless serve the same function as a connecting strut because they connected the macroelements with a three-part connector to impart flexibility, which is the purpose, the function of the connecting struts. So the way the hypothetical claim three attempts to address that is by replacing a requirement of a specific geometry that's intended to grant flexibility, and instead just putting in what we view as a broader functional limitation of flexibility. I guess if we're moving on to whether or not your hypothetical claim is a legitimate claim in the sense that it only broadens and doesn't do any form of narrowing, I guess what troubled me about the claim is that it talks about having a connecting strut column that provides increased flexibility compared to the first and second expansion columns. And so I understand the patent does talk about a connecting strut column providing some flexibility, you know, to the overall stent, but now the claim limitation is speaking in a comparative way that I didn't see anywhere in the patent, and now I'm wondering what does that mean to be increasing the flexibility compared to the first and second expansion columns? Well, understood. Are you talking about longitudinal flexibility? Yes, but I'll... It doesn't say that in the claim, though. Well, I mean, the specification describes the relevant... In the specification, you're right, it talks about in terms of longitudinal flexibility, but the point is just this, and this is why in an iterative Merkman kind of way, I mean, if we need to rephrase it, we could have. The idea is that the stent is comprised obviously of... Well, for the BSC stents, you have the macro elements and the micro elements, which in our view corresponds to the expansion columns, the connecting struts. The idea of expansion columns is they provide the strength. So the stent has to do two things. It has to get through the tortuous vessels in the body to get where it needs to be without actually getting there without causing other problems along the way. And then when it gets there and inflated, it needs to be strong enough to actually prop up and then stay open to do its job. So the idea is the macro elements provide most of the strength. So when it opens up, the macro elements are strong, but they don't have the flexibility or the expansion struts. The idea is to have the geometry of these connecting struts that will be able to maneuver more flexibly through. So our attempt, which we think was fine, but I'm sure it could be phrased differently to connote that, was to say that it's the connecting struts that impart flexibility relative to what you would otherwise have. I guess for me, to go back to the hypothetical claim, your hypothetical claim now excludes an embodiment in which, say for example, the connecting strut column provides a flexibility that's equal to the amount of flexibility provided by the first and second expansion columns. Under the issued patent claim, where it just talked about an intermediate non-parallel section, there is nothing in that issued claim that precluded the possibility of the connecting strut column to have the same amount or even less flexibility than whatever the first and second expansion columns had. But now you've removed that from the hypothetical claim by requiring that the connecting strut column have an increased amount of flexibility compared to the first and second expansion column. I guess there are two points there. One is the whole point of the invention, as described in the specification, is that the connecting strut imparts flexibility. To the overall extent, but it doesn't say anywhere that the importance of having a non-parallel intermediate section is to provide increased flexibility vis-a-vis, in comparison to the first expansion column and the second expansion column. It's true. That's the first time you see that thought is in your hypothetical claim three. Well, I think it's not that thought. It's those words. And if those words were unartful, the point of it is just to explain, okay, what does it mean for the connecting strut to be providing flexibility? We're trying not to be... Right, but what you're doing is taking all structural components out of your claim and saying, all we need to do is claim the function of increasing flexibility, then that would cover virtually any kind of step, right? Which it would be our problem, in the sense that if the claim's too broad, if the hypothetical claim is too broad, well, then that would prejudice us when we actually get to the incinerative analysis. We don't think it is, but that's certainly not a basis for rejecting it. And the reason we don't is, if you look at the hypothetical claim, it leaves most of the architecture in there. It only takes out the non-parallel intermediate section and replaces that with the flexibility, because that's what they said was not present. In other words, you have a three-part stent, right? The proximal end, an intermediate section, and distal end, they agree that the proximal and distal ends are there. That's what they call the short straight connectors. So the dispute was over the middle. So all we took out of the literal claims is the middle. We did leave some architecture in, but if we didn't leave enough in, that would be our problem, unremanded incinerament herring. The other thing, though, is that the issue is not just narrowing in the abstract. In fact, to some extent, there's nothing wrong with narrowing. The point is to substitute the literal with an equivalence. And equivalence aren't always entirely encompassed within. So for example, if a screw is an equivalent of a nail, they're different. They're equivalent. One's not necessarily narrower. And in DuPuis... Are you saying you don't read stream feeder as requiring, when you come up with a hypothetical claim, to broaden the issued claim only, and that, in fact, under stream feeder, you're allowed to eat away at some of the issued claim scope in devising a hypothetical claim? You have to broaden it for purposes of the equivalence theory that the jury heard at trial. In other words, the idea of stream feeder is, you obviously have to broaden the claim to encompass the accused product. That's your theory of trial. You can't then do some other unrelated narrowing to try to avoid the prior art. That's gaming the system. But take DuPuis Spine. There, as a hypothetical claim, this court replaced a spherical shape with a conical one. And those don't fall within one another. But the point is that the conical was the equivalent at trial. Therefore, that's what you had to have in the hypothetical claim. Because if the narrowing... What did your expert really say was the equivalent at trial? All your expert really said was, you know, the magic words of it does the same thing in the same way with the same result. But it didn't explain how your expert didn't tell you. Maybe that's the problem. If your expert had a real view of what the equivalence theory was, he might have been able to give you a better hypothetical claim. No, the equivalence theory... And let me... Sorry, I lost... This is what I was looking for. The equivalence theory... I mean, the illustrator, for example, on the exhibit, it's page 41 of our brief, also found in appendix page 11, 649. And here, the red structures, these are the macro elements. And everyone agrees those are expansion columns. The micro element in the middle between the reds, the question is whether that's a connecting strut. And our expert's testimony is, you look at the green part, that in our view, that's even if you don't want to call it a connecting strut for the reasons that they've given infringement defense, it still has the same... It still has functional way result. Why? Because the screen part is a three-part connector that connects one expansion strut to the next. Can you give us the sites to the expert that you're... The expert on the functional way result? Yeah, that's... Sorry, the expert discussed the functional way result test. And this was Mike Lee. That would be a joint appendix. One site would be 87, 53 to 54. 87, 53 to 54. And then Dr. Kronos also followed up on it at appendix pages 92, 50 to 51. But isn't Lee the main event? Compared to... Yes, Lee's our main... Lee's our primary expert. So it's 87, 53 to 54. Did you say 8, 87 or 87? 87. 87, 53. Here's a concern on that. If you know we have this requirement under doctrinal equivalence that the patent order needs to come forward with particularized testimony and linking argument on a limitation by limitation basis, we have a certain requirement for that to make sure that the jury doesn't get confused by a very conclusory doctrinal equivalence analysis. So if the literal... If the no literal infringement verdict stands up, it stands up because the jury concluded that the micro elements are expansion columns, not connecting strut columns. And so your theory, as I understood your brief, is there's nothing wrong with the micro element expansion column also being a connecting strut column as claimed. And that troubles me because for purposes of doctrinal equivalence. And that troubles me because now you are having one structure in the accused product mapping onto two different structures in the claim. And the claims clearly calls for expansion columns to be coupled to connecting strut columns. And I don't understand how this micro element can couple to itself in the sense that it's, I don't know, some kind of Jekyll and Hyde role where it's both Jekyll and Hyde at the same time. It's a little schizophrenic to understand how this one feature of the expressed stent is actually both structures at the same time. Coupling to itself. Yeah, and I think that's, I mean, that's their, that's their best literal infringement. And so what, so getting to particularized testimony and linking arguments, sorry this question is so long, is that your expert didn't explain why in the event that there's no literal infringement, this expansion column in the, i.e. the micro element is also at the same time an expansion column coupled to a connecting strut column. Right, well the point of the expert testimony is that take, you've got the macro elements expansion columns in the middle. Call it whatever you want. You can call it a not, you can call it anything you want. The point is that what's there in the middle, the micro element, you know, whatever else you want to call it, it functions, it has the same, substantially the same functional way and result as a described connect, a connecting strut because it couples the two things that are on the side of it in a way that adds flexibility. And he presented extensive then doctrinal equivalence testimony, including, you know, benchtop testing, find an element analysis, he has his own documents showing that what's in the middle there, whatever you want to call it for literal purposes, that imparts the added flexibility. But it's fair to say that there's no expert testimony or testimony anywhere that says, okay, if, even if this micro element is deemed to be an expansion column, it is nevertheless also at the exact same time serving the connecting strut column for purposes of claim one. Even though you don't have to make any adjustment to it in order for the doctrine of equivalence analysis, for the doctrine of equivalence analysis, we're just saying it's also at the same time a connecting strut column. Well, no, for equivalence purposes, the micro element is equivalent to the recited connecting strut column, right? That's why equivalence is different from literal. We're saying that the connecting strut is equivalent, the micro element in the accused product is equivalent to a connecting strut because it substantially is the same way it resolves. I should probably say what little time I have left. Can you answer my question? How does it couple to itself under your doctrine of equivalence? How does the micro element, the micro element expansion column couple to the micro element connecting strut column? I don't think it can, right? The claim calls for a connecting strut column to couple to the expansion. Right, which is why I'm trying hard not to push back on literal infringement and just to talk about equivalence. But for equivalence, I mean, the way the product works, you have macro element, micro element, macro element, micro element. So between two macro elements, you have a micro element. I'm not arguing right now that micro element is a connecting strut. I'm saying that the micro element serves the same function as the connecting strut because it connects one macro element to the next in a way that was proven in a variety of ways to impart the added flexibility. And so in the middle, you can call the micro element another expansion column for literal purposes. I mean, I'm not trying to fuss over that right now. My point's just that macro, the micro element is in between, the micro element is in between two macro elements and two expansion columns. And it joins them in the way that has the same function way result as the experts testify to and the jury agreed with. And that then becomes the predicate for hypothetical claim three. But again, with hypothetical claim three or five, if the point is that there's some words in there that look new or that seem different, then what the court could have done is either what this court did in Streamfeeder, modify the claim, or what- We modified the claim in Streamfeeder and Ultratext both to explain why it snares the product. I mean, we didn't say we're saving the patentee here, by modifying the claim. We're saying that the claim was that you could not do the claim the way it was done and the only way you could actually have a fair claim would it snare the prior article. Well, that turned out to be the result in those cases. But I mean, the court, you know, quite properly, you know, did not just kick the plaintiff out, kick a jury verdict out because it didn't like the way a claim had been framed. It reframed it and then went ahead. Or, you know, as a markman, we could have done something that's more iterative in the district court still. The concern I'm having, and we're sort of full circle because this is exactly where we started our discussion this morning. And the word you use repeatedly is could. I mean, I guess he could have done pretty much anything. So I don't think the inquiry involves whether he could have done it. The question is whether he was required or compelled to do it. And that to me is a little bit of a different analysis. Right. But the question then is if the first proposed hypothetical claim, the first proposed round of hypothetical claims, the district court sees a problem with them. The question is, does that forfeit the jury verdict then and there? And this court's never adopted any such a draconian result. No court or case ever has. Can you explain the origin of the 11 hypothetical claims? How did, did you shove them all in at the same time? Was it an iterative process? It was not iterative. They were all presented at the same time. And if it matters, it wasn't really, there's some double counting in the 11 figure. It was not really 11, but there were different claims that address different aspects. But they were, it was all at once. They were all presented at once, rejected simultaneously at once in an order that simultaneously dismissed the case. There was no iterative back and forth like one would have in a Markman, which is really the only analogy. Instead, the court did something totally unprecedented, which was to overturn a jury verdict based solely on its view that the hypothetical claims were framed improperly. Okay. We'll restore your rebuttal. Thank you. May it please the court, if I may start where we came full circle, which is on this analogy to Markman. I would respectfully suggest to counsel that Markman is an inapt analogy for a very simple reason, that there is no burden of proof in a Markman proceeding. Each side bears equal burdens. And in fact, the court is obligated, to come up with a construction if it believes it's important to infringement or validity issues down the line. How would you interpret what the court did in Streamfeeder though? In Streamfeeder, this court clearly didn't simply reject the patent owner's hypothetical claim and then reject the doctrine of equivalence conclusion. It went further and then, and still did an analysis on a modified version of that hypothetical claim. Your Honor, Is that what we're supposed to do now? No, Your Honor. That's why we're talking about burdens of proof here. I believe the court, But then what did the court do in Streamfeeder? It did what this court does from time to time in any many number of contexts, which is to say party A loses. And even if they were right, they lose for this additional reason. Even if we gave them the benefit of the doubt, even if we threw them a bone, they would still lose. That would be an implicit reading of Streamfeeder, right? Because Streamfeeder doesn't say that even if language. No, but I think that is what happened. I think that that's the fairest reading. Because it certainly didn't say that the district court was obligated. It certainly didn't say that this court was obligated. It just did it. It didn't explain why. And I think the fairest reading of why it did is to say it wouldn't matter. There was no saving this claim. It was just as we're comfortable in our initial decision, both as a procedural matter and as a matter of the merits. I think that's all that was happening there. So, and this may put you in a difficult spot, but I mean, the DOE theory as it relates to just infringement makes a lot of sense. And I certainly understand why the jury found infringement under the Doctrine of Equivalence based on the expert testimony that we received. Can you envision any hypothetical claim that would not read on the prior? Sitting here today, no. We presented what we thought was the most straightforward hypothetical claim, which was to scratch out the specific geometric limitations and then said, does that read on the prior art? And the answer was, yes, it does. And we cited that. And that's in the appendix. And we also said for that matter, it wouldn't cover our products. It was 0 for 2 in that regard. But to answer how it went, counsel, I think, got it a little bit wrong as to how the iterative process worked. The 11 claims Your Honor asked about, and this kind of goes to your point, Your Honor, which is the district court ordered us to meet and confer, set up a process. And plaintiffs didn't want to participate in this process. And so they fought trying to involve themselves. But at the last minute, they threw six claims our way as part of a meet and confer. And we wrote back and said, no, those six claims don't work for one of two reasons. Either they're narrowing the claims or they're not changing the claim scope at all. Then they sent five more claims, hence the 11 claims. Now, the double counting, there was some dispute at the time whether two of the claims of the original six overlapped with the five. So it's either nine or 11. But in any event, then as the transcript reflects, the judge walks into the courtroom and says, how are we going to handle 11 claims? And the plaintiff comes and says, well, Your Honor, we've reduced it to two. And they argued hypothetical claim three and five. So to say it was an iterative is not, I think, reflective of the record. It was iterative vis-a-vis us. We explained our, it's not like we surprised them at the hearing and said, here's the problem with the claims. We had extensive discussions with them. And that's where it went back and forth and back and forth. And then they decided to take two claims to the district court. What's your response to the argument that you can narrow in ways that really don't relate to the debate that we're having over DOE, as long as you broaden in the more relevant circumstances? There are two responses. And one is kind of overarching a lot of what was said in the brief, the briefs, which is, there's, I think, a fundamental misperception about how this process works in plaintiff's briefs and argument, which is once you get to the hypothetical stage, equivalence doesn't matter anymore. Equivalence is irrelevant. The question is, here we have a claim. It's of this scope. We know it's not infringed. Now we need to expand it such that it infringes. We need to expand it just enough that it captures the accused product. As a literal matter, equivalence is irrelevant at this stage of the proceeding. So now that we've expanded it to cover the accused device just enough, now we're going to say, does that also read on the prior article? And if it does, well, then you weren't, you're not entitled to that claim scope. So to your point, Your Honor, so that's, that's kind of, even today, we're hearing a little bit of a misunderstanding of how the process works. But then to Your Honor's direct question, what the courts have said, and Streamfeeder says, and I believe it was Ultratex as well, is we're not going to redo what happened in the patent office. And if you're nipping and tucking, expanding and trimming, we're not here to do patent prosecution for you. And so if you're narrowing in any way, shape or form, that's not allowed. The only thing you're supposed to do is take that circle and expand it just enough. So now it literally covers the accused device. That's, that's the process. And that's not understood. Now, on hypothetical claim three, I want to point out a couple of things that may have gotten lost in the wash, which is that the district court took expert testimony, live expert testimony, subject to extensive cross-examination. And the district court found, and this is, I think, A11, as a result of that testimony, found that the claim, the hypothetical claim three was broadening. So we hear attorney argument as to why it wasn't broadening but this isn't a de novo question here. We have underlying discussions of fact by the experts that the court accepted. The second thing, and your honor, this goes to your point. There's something, there's a little bit of shell game going on in what they did with hypothetical claim three. Because the original claim called for the first connecting strut and then described its shape. So it said it has to be non-parallel. That was to the strut. But the hypothetical claim doesn't talk about the strut. It talks about the column. It now says the first connecting strut column is configured. So not only are they adding these limitations to narrow it, they're even changing what the limitation's talking about. They're no longer talking about the geometric configuration of the strut. They're now... It's okay if the new limitation that they're adding, the functional limitation, encompasses that structural limitation that they removed. In other words, they converted a structural limitation to a broader functional limitation that encompasses the original structural resolution as well as virtually any other structure that achieved that exact function. So that's really the question of whether when you look at what was deleted and what was added, do we end up with a larger claim scope? Because now we have a functional version of a previously structural limitation. I take your point, Your Honor. I would just note that Wilson and DePue counseled us to expand the claims enough to cover the accused device and not much more. Now, counsel is right that if you expand it too much, you'll actually help us at the end of the day. But I take your point. My fundamental point is the district court found not just as a matter of grammar, not just as a matter of common sense, but as a matter of fact in light of expert testimony that adding the limitation narrowed the claim in contravention of stream feeder. I briefly, Your Honor, on this, the alternative ground for affirmance and the failure to disclose doctrine of equivalence, I would ask simply on rebuttal for counsel to point us where on the expert reports you have a particularized function way result analysis of any kind. There is extensive discussion of function in the context of a literal infringement analysis in one of the reports, but it's not particularized. And more importantly, there's no way discussion at all, and it's not tied to any claim limitation. It simply should not have been allowed to go forward from that point. I guess the other side would say, and I'd like to hear your response. Yes, Your Honor. Is that, well, the squiggly part of the micro element is serving as the intermediate section of the connecting structure. So the function they identified is flexibility. Now, this is in the record, but it's not argued in the briefs. The reason that the micro elements are more flexible is because they are small, not because they have that architecture. They are smaller and thinner. So it's a matter of the composition of the metal, not the geometric shape. Now, the reason that's not in the record trial is because their experts couldn't say they operated in the right way, the same way. They knew that even under their equivalence theory, that the function of flexibility was not met in the same way. If they had had to put that in a particularized limitation by limitation approach, as called for in Aquatex, that would have been brought out in stark relief. Should I turn to the issue that was our cross appeal at this point, unless the court has further questions? That is a contingent cross appeal, though, right? I mean, to the extent you call it a cross appeal, but it's contingent because if, in fact, there's no infringement, then that cross appeal doesn't even get resolved. As a practical matter, you're probably right here. We struggle with this issue, too, Your Honor, as to whether it was an alternative ground for affirmance or a cross appeal. Here's why we called it a cross appeal, and I leave it to Your Honors if you think we fell on the wrong side of the line. If tomorrow, they sued us on a different product prior to the patent's invalidation and said, well, okay, so Express isn't a contingent payment product, but this Stent B is, then in theory, the issue of the import of the patent office activities, et cetera, would be relevant to Stent B. Now, the odds of that happening are extreme. If we affirm the judgment otherwise, then that becomes an advisory opinion. How do we do that without having the context of what the other product was? You're probably right, Your Honor, but as you know, there's some division in this court about what's a cross appeal and what's an alternative ground for affirmance, and out of an abundance of caution, we labeled it as such. In theory, the relief requested in the cross appeal is broader than merely affirming the district court's judgment. Hence, under some characterizations of the test, it's a cross appeal. It's not an alternative ground for affirmance. As a practical matter, under the facts of this case, you're absolutely right. With that, unless the court has any further questions, I will give back some time. Good morning. You may please the court.  It's rebuttal, isn't it? How do you get around the fact that, as the trial court said, that on cross examination, Mr. Lee admitted that the addition of the flexibility functional language would narrow the original claims of the patent? No, because he didn't. I mean, what he testified to, what he eventually testified to was that if you put that language in there compared to nothing else, it's narrowing by definition. But he said if you put this in replacement of the other, it's not narrow. So to go through, this is this occupies something like 10 pages of the trial transcript because they kept asking him the same question. But it starts around page 11137, where they keep saying. Is this volume three? Yeah, I'm sorry. Sorry, it is. But the point of the questions repeatedly was, was Mr. Lee just focus on this language that you're adding to replace the other language? Just that by itself, does that narrow it? And I mean, for a while, he kept saying, well, there's no there's no narrowing, but eventually when they got him pinned down, it goes over and over and over. You know, OK, well, eventually it's OK if that's always focusing on, then sure, having that language in there compared to nothing is limiting. But as a replacement, it's not is the important thing. And it's sort of it ends around page appendix page 11170, line 15, where, you know, he says, yeah, I don't I don't think it's narrower. I think it's equivalent. It's clarifying. And that's why in context, he was all he was saying was, no, it's not narrower. But when he was asked these carefully crafted questions about is it narrower compared to no other language? Sure, it's narrower, which brings me to I mean, one of the other points is counsel was talking about whether limitation was added here. And the answer is no. One was replaced with another. It's the whole point of equivalence or hypothetical claim analysis replace a limitation with another. And if you can call that adding, but it's really replacing. And there's nothing wrong with that because that's what you you necessarily have to do. But if it in any way narrows the scope of the original claim, one original claim, one is like a circle. And then, yes, you've removed a limitation. So now maybe it's the circle gets a little bigger one way. But now you've eaten into it a little bit through the addition of your claim language. Then is that a legitimate thing to do? It's as in stream feeder, it's illegitimate if the way you've eaten into it does not relate to the theory of equivalence, you know, the doctrine of equivalence theory, the infringement. And instead, it's just there to narrow the claim to try to evade the prior art. But again, it's, you know, if it's the way if the theory of equivalence is you don't need a cone. If you don't need a sphere because a cone is equivalent. Well, the sphere is going to be both broader and narrower than a cone in some respects. But that's OK. If the way that it's broadened for doctrine of equivalence is the same as the way that it's broadened for hypothetical claims, because what you're looking to do is just to test the equivalence theory at trial against the prior art. And if there's any other immaterial narrowing that doesn't go to the equivalence theory at trial, the theory for infringement, that it's not a problem, which is which is why one, that is de Puy. And two, that's also why stream feeder, you know, said that what you can't do is broaden one respect for infringement, but then narrow in a different respect to evade the prior art. At 8753-54, I see Lee testifying about having performed some test that shows some flexing in the relevant area of the accused products micro element and then conclude. So it's doing the function of flexing. But that's only the function aspect of the function way result analysis. Is there something that where he hones in on why it's substantially the same way, what he's pointing at and explaining why it's the same way, even though it's not a literal infringement? Well, this is, I mean, this is one of these cases where they're, you know, the function way result, I mean, the way here, he continued to tie to the fact that, look, he thinks there's a literal infringement, right? Because he thinks that what's between the micro elements between the macro elements and his view satisfies all the claim limitations. You got the three part connector offset peak to peak. It imparts flexibility in exactly the way that the specification of patents call for the way. OK, his point, the point then for equivalence is just that if you don't want to call the micro element, if you don't want to call what's in the middle, a connecting strut, call it anything you want, call it spinach. It's still, it still is, it's still the same way because it has, you still have, you know, those three part shapes that connect peak to peak, offset to offset with the non-parallel intermediate section. It doesn't matter whether you want to call it a connecting strut because you can also call it expansion column. That's fine for present purposes. The point's just that whatever you want to call the micro element, whatever you want to call the part in the middle, it is substantially the same way because the pieces are still the same. But isn't the point of, as I read Dr. Lee's testimony, what he said is you could have, you could envision a claim that would take away certain structural elements and therefore broaden what that middle column is. And in that way, you could literally infringe, or you could say that there's little infringement, but then you wouldn't have the function, which is the flexibility. But it is true that the function and result have to, the function has to be flexibility with the result that you can go through the body. So if you did something else that would not serve the function. So what he said is that yes, when you add that functional element, that you are narrowing the claim in a certain way. In another abstract context, I can see where you could have a situation where that could be the case. But remember here, under this specification, under the expert testimony of both parties' experts, what the micro element adds, the micro element adds flexibility. And the point of the connecting strut, the whole point of the connecting strut is to add flexibility. I mean, before the invention, which goes back to the mid-90s, it was understood that the problem was you had these stents that were either too rigid or too flexible. They were too flexible, but then they weren't strong enough when they got where they were going. So they collapse. Or they were too rigid and they just couldn't get where you were going. And if you opened up the body to get the stent there and it didn't get there, patients tended to die on the table. Right. So that's the point of this. I thought that was the point that he said, that structurally, you can envision a connecting strut that would, that would claim to a connecting strut that would make the accused product literally infringe that claim, but it would not provide the flexibility that is necessary to not read on the prior art. Hopefully I'm not just getting hung up on language, but if it is the described, if it's the connecting strut that's described in the spec, in the claim, the literal connecting strut in the claims in spec, the whole point of the literal connecting strut is that because of its geometry, it does add flexibility. That's what it's there to do. Right. But there's nothing in the patent that teaches or suggests that whatever flexibility it provides, it necessarily is an increased amount of flexibility over the flexibility provided by the first and second expansion columns. But the idea of this, the whole, I don't know, sometimes the most obvious things aren't the ones that are said in technical documents, but the whole point of the expansion columns, right, is that they provide the strength. They have to be bigger But not all of them in the prior art did provide flexibility. This is the question I most wanted to get back to on rebuttal, actually. It was your question about if you got your hypothetical claim, how could you possibly win incinerament anyway, which I think is really important because the district court didn't reach it. We haven't really discussed it in the briefing, but to understand where we were back at that point in time, and this is in the, Mr. Lee testified to all this in the incinerament hearing, the thing that I mostly rely on is WeeJay. WeeJay is not prior art. Dr. Zhang swore behind it and presented considerable evidence it was not enabled. The other two references that they rely on, and I recognize these are disputed facts, but that's the point. The district court should have resolved the incinerament disputed facts. The other two references involved single-piece connectors that did not impart flexibility, as opposed to the three-part flexible ones with this design. In fact, Brown uses a connector for stability and actually teaches a way from using it for flexibility, which is the exact opposite of what Dr. Zhang invented. And the reason that this being a groundbreaking invention is part of what helps explain what BOC paid $50 million down. And then, you know, with additional payments due later, which is what we're here to talk about today. All we're asking for, though, is a chance to actually have our actual incinerament case heard. Thank you.